## 20974

NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant, v. Sally Shaw DOUGLAS, John W. Howard, III, as Administrator of the Estate of Janet C. Edmonds, deceased, Wilma Harkins Smith, Gordon M. Powell, James Mullinax d/b/a Greenwood Upholstery, Kevin C. Edmonds, Walter G. Gutman, Aetna Life & Casualty Insurance Co., Respondents.

(255 S. E. (2d) 829)

244

*F. Dean Rainey, Jr.,* of *Rainey, McKay, Britton, Gibbes and Clarkson,* Greenville, *for appellant.*

*Cary C. Doyle,* of *Doyle and Cofield,* Anderson, *for respondent Aetna Life and Casualty Insurance Company.*

June 5, 1979.

NESS, Justice:

This declaratory judgment action was commenced by Nationwide Mutual Insurance Company to determine whether a policy extended coverage to an insured while operating a stolen vehicle. The trial judge, sitting without a jury, concluded the insured was afforded coverage under the terms of her policy. We disagree and reverse.

Appellant Nationwide issued a policy to Janet Edmonds on her 1965 Oldsmobile. On March 31, 1976, Ms. Edmonds received a 1969 Pontiac as a gift from her husband. Although her husband purchased the car with knowledge it was "hot," there is no evidence that Janet Edmonds knew the vehicle was stolen.

Ms. Edmonds was killed in a head-on collision on April 5, 1976, while driving the Pontiac. The principle respondent in this suit is Aetna Life and Casualty which provided uninsured motorist coverage on the Chevrolet which collided with the Pontiac.

As the insured was not operating the automobile described in her policy, any coverage to be extended must be derived from Article VI of the Nationwide policy entitled "Use of Other Land Vehicles." The trial court concluded the insured was covered under any one of four separate categories in Article VI.

Initially, the trial court held coverage was afforded under paragraph (1)(a) of Article VI which extends coverage to the policyholder while operating "a land motor vehicle not owned or not stolen by the Policyholder, while temporarily being used as a substitute for the described automobile when withdrawn from normal use because of breakdown, repair, servicing, loss or destruction . .. ." This was error.

There is no evidence that Ms. Edmonds was using the Pontiac as a temporary replacement for her Oldsmobile

while the latter was withdrawn from normal use due to breakdown, repair, etc. While there was evidence that the Oldsmobile was not in optimum condition, it was operable at all times. The insured's husband testified he drove the car from Laurens to Columbia and used it for approximately six months following the wife's death. (Tr. p. 29).

Generally, under a temporary substitute automobile clause, a vehicle cannot qualify as a temporary substitute unless the automobile described in the policy is withdrawn from normal use on the date of the accident. *Pennsylvania T. & F. Mutual Casualty Ins. Co. v. Robertson,* 259 F. (2d) 389 (4th Cir. 1958); 7 Am. Jur. (2d) Automobile Insurance, § 103; 34 A. L. R. (2d) 936, 947-951; *Erickson v. Genisot et al.,* 322 Mich. 303, 33 N. W. (2d) 803 (1948). However, it is not necessary that the "owned" car be completely disabled or actually under repair. *Allstate Ins. Co. v. Aetna Casualty & Surety Co.,* 326 F. (2d) 871 (2d Cir. 1964); *Midcontinent Casualty Co. v. West,* 351 P. (2d) 398 (Okl. 1959).

We do not believe the testimony that the insured's Oldsmobile had some mechanical problems was sufficient to establish it was withdrawn from normal use. Moreover, in order for coverage to be extended under a substitution provision, the use of the alleged substitute automobile must be *temporary. Central National Ins. Co. of Omaha v. Sisneros,* 173 F. Supp. 757 (D. N. M. 1959); 7 Am. Jur. (2d), Automobile Insurance, § 104. Ms. Edmonds' husband testified that he gave the car to her and intended her to have title and ownership of it. (Tr. p. 35). The record is barren of any evidence that she was using the Pontiac temporarily. Accordingly, the Pontiac was not a temporary replacement vehicle and the trial court erred in holding that coverage was extended under this provision.

The trial court concluded that coverage was also provided under paragraph (1)(b) of Article VI of the Nationwide policy. Pursuant to that provision, coverage is extended

when the policyholder is operating a motor vehicle, the "ownership of which is acquired by the Policyholder . . . which has not, except as a replacement, been the subject of such ownership for more than 30 days next preceding the occurrence." The intent of this automatic insurance clause is to provide temporary liability coverage for a newly acquired vehicle for up to 30 days after acquisition of ownership. See 7 Am. Jur. (2d), Automobile Insurance, § 100. The trial court reasoned that since Janet Edmonds acquired ownership of the Pontiac less than 30 days prior to the accident, she was covered under paragraph (1)(b) of Article VI. We disagree.

Although Ms. Edmonds was in possession of the stolen Pontiac, she was not its *"owner"* under the definition contained in the Motor Vehicle Financial Responsibility Act. Code § 56-9-20(11) (1976) defines an "owner" as "A person who holds the legal title of a motor vehicle . . ." Moreover, two prior decisions of this Court construing automatic insurance clauses appear to require actual ownership rather than an insurable interest. In *Bankers Ins. Co. of Pennsylvania v. Griffin,* 244 S. C. 552, 558, 137 S. E. (2d) 785 (1964), the Court stated:

"In the case of *Robinson v. Georgia Casualty & Surety Co.,* 235 S. C. 178, 110 S. E. (2d) 255, it was said in regard to a similar clause providing for automatic coverage on a newly acquired automobile that such clause 'specifically, and in explicit language, requires that to be covered as a newly acquired automobile the automobile must be one acquired by the named insured. In other words to be covered as a newly acquired automobile, the vehicle must be one in which the named insured not only has an insurable interest —he *must own the automobile.*' " (Emphasis supplied).

In view of our conclusion that Janet Edmonds could not have acquired ownership of the stolen Pontiac, the trial court erred in holding that coverage was extended under this provision.

Next, the trial court construed the phrase "except as a replacement" in Article VI(1)(b) to eliminate not only the 30 day limitation on coverage but also the requirement that ownership be acquired. This construction was erroneous.

There is no apparent reason to require ownership in the case of an additional vehicle and dispense with it when a replacement vehicle is involved. In any event, it was error to characterize the Pontiac as a *replacement vehicle* since the insured's Oldsmobile was still in her possession and operable.

Finally, the trial court held coverage was provided to the insured under paragraph (3) of Article VI which extends coverage to the policyholder while operating "any other land motor vehicle except a temporary substitute land motor vehicle while used by the Policyholder . . ." provided it is "(ii) not furnished for regular use to such Policyholder . . ." or "(iv) is not stolen."

The trial court concluded the language of (iv) was ambiguous because in two other paragraphs of Article VI, the exclusion applies to vehicles "stolen by the policyholder." It is not necessary for us to determine whether an ambiguity was created by paragraph (3)(iv) because we conclude coverage was excluded by paragraph (3)(ii) since the Pontiac was *furnished for the insured's regular use.* As stated earlier, all the evidence indicates the stolen vehicle was a gift from the insured's husband; there is no indication that Ms. Edmonds' use of the Pontiac was temporary in nature.

We conclude the trial court erred in finding that coverage extended to Janet Edmonds under the terms of her Nationwide policy.

Reversed.

LITTLEJOHN and RHODES, JJ., concur.

LEWIS, C. J., and GREGORY, J., dissent.

LEWIS, Chief Justice (dissenting):

I would affirm the order of the lower court upon the ground that the ownership requirements of the policy of insurance in question were met under the facts of this case and, therefore, dissent. While the lower court based its order on several grounds, the following from the order under appeal correctly sets forth the pertinent facts and legal conclusions which, in my opinion, require affirmance:

"This action was brought by the plaintiff (hereinafter referred to as 'Nationwide') pursuant to the provisions of Section 15-53-10, *et seq.* of the Code of Laws of South Carolina, 1976, seeking a Declaratory Judgment to the effect that its automobile liability insurance policy did not provide liability insurance coverage to its named insured, Janet Edmonds, with regard to an automobile accident occurring on April 5, 1976.

"The accident occurred on Highway 221 near Laurens, South Carolina, when a 1969 Pontiac automobile being driven by Janet Edmonds collided with a 1968 Chevrolet automobile owned by Gordon M. Powell and/or James Mullinax, d/b/a Greenwood Upholstery Co., and which was being operated by Wilma Harkins Smith. As a result of the collision, Wilma Harkins Smith and a passenger in her vehicle, Sally Shaw Douglas, received personal injuries and Janet Edmonds sustained personal injuries which resulted in her death. The defendant, Sally Shaw Douglas, has already instituted suit against the Estate of Janet Edmonds for personal injuries and that action is now pending in the Court of Common Pleas for Greenville County. Wilma Harkins Smith has also notified Nationwide of her claim for damages arising out of the automobile collision.

"In the present action, John W. Howard, III, as Administrator of the Estate of Janet Edmonds, has filed his Answer generally denying the allegations of the complaint and asserting that Nationwide's policy provided liability coverage. Wilma Harkins Smith has also filed her Answer denying the material allegations of the present action by Nationwide.

The parties have all consented to an order dismissing the action against Walter G. Gutman, the registered owner of the 1969 Pontiac automobile, since all parties concede that the automobile was stolen from the defendant, Gutman, on or about March 31, 1976.

"The defendant, Aetna Life & Casualty Insurance Company, provided uninsured motorists coverage on the 1968 Chevrolet being operated by the defendant, Wilma Harkins Smith, and Aetna was made a defendant since in the event that Nationwide provided no coverage for Janet Edmonds, the defendant, Aetna, would necessarily have the uninsured motorists coverage. Aetna has filed an answer denying the allegations of the complaint and asserting that Nationwide does provide coverage under one or more of the provisions of the policy and further asserting that the provisions of the Nationwide Insurance policy relating to stolen vehicles are ambiguous and inconsistent and that such ambiguity should be resolved in favor of coverage.

"Thus, the issue of whether or not Nationwide's policy of liability afforded coverage to Janet Edmonds at the time of the accident is primarily being argued between Nationwide and Aetna, the other parties not being significantly affected. The material facts involved in the coverage issue are not seriously in dispute. They are principally submitted to the Court through the deposition of the husband of Janet Edmonds, Thomas A. Edmonds, and by agreement of counsel, the transcript of a recorded statement given by Mrs. Mary Chumbley, the mother of Janet Edmonds. Since the insured, Janet Edmonds, was killed in the automobile accident, these appear to be the only people having any knowledge on this subject and there is no significant variation between their statements. In addition to the deposition and the statement, the Nationwide policy and a letter of Nationwide addressed to the Administrator of the Estate of Janet Edmonds were introduced into evidence.

"The evidence clearly establishes and this Court finds the following facts:

"1. Nationwide at the time of the accident of April 5, 1976, had issued to Janet Edmonds a policy of liability insurance describing as the insured vehicle, a 1965 Oldsmobile F-85 which had been in her possession and which she had been driving for some time prior to the accident.

"2. At the time of the accident, Janet Edmonds was married to Thomas A. Edmonds; but they had been living separately and apart for some period of time and at the time of the accident on April 5, 1976, Thomas A. Edmonds was not a member of Janet Edmonds' household.

"3. On March 31, 1976, Mr. Walter Gutman, the true owner of a 1969 Pontiac automobile reported to the Columbia police that his automobile had been stolen by parties unknown.

"4. On March 31, 1976, Thomas A. Edmonds obtained the automobile from one Marvin Richardson, knowing at the time that it was a stolen vehicle.

"5. On April 1 or April 2, 1976, Thomas A. Edmonds gave the 1969 Pontiac automobile to his wife, Janet Edmonds.

"6. When Janet Edmonds took possession of the 1969 Pontiac automobile, she did not have actual or constructive knowledge that the vehicle was a stolen vehicle and Thomas A. Edmonds assured her that he would obtain a clear title for her at a later date.

"7. The 1965 Oldsmobile F-85 automobile, the described vehicle in Nationwide's policy, remained at the home of Janet Edmonds and had not been operated by her since the time she gained possession of the 1969 Pontiac automobile.

"8. Thomas A. Edmonds came into possession of the 1965 Oldsmobile automobile within a few days after the accident of April 5, 1976, and he drove it to Columbia where he used it only on limited occasions up until October of 1976.

"9. Although the 1965 Oldsmobile automobile was operable in the sense that it did not need extensive mechanical repairs to put the engine in good running condition, it was not in generally good mechanical shape and, without question, it needed tires, brake repairs and some electrical and mechanical work. It was questionable whether the automobile could be used for trips in excess of 70-90 miles.

"10. The only inference from the testimony regarding the condition of the 1965 Oldsmobile automobile is that if Janet Edmonds or any other person had continued to operate that automobile, she would have been in violation of Section 56-5-4870 of the 1976 Code of Laws of the State of South Carolina regarding the maintenance and adjustment of brakes and in violation of Section 56-5-5040 requiring that every motor vehicle operated upon the highways of this State shall be equipped with tires in safe, operating condition.

"Since Janet Edmonds was not operating the described automobile, the 1965 Oldsmobile F-85, then if coverage is to be extended to her, it must be under Article VI of the Nationwide policy entitled, *'Use of Other Land Vehicles'*. An analysis of the Nationwide policy reveals that it offers automatic insurance coverage to the named insured while driving vehicles other than the described vehicle in four (4) separate categories. These would be the situations described in paragraphs 1a, 1b and paragraph 3 of Article VI. Nationwide contends that since the 1969 Pontiac was in fact a stolen vehicle; that true 'ownership' of the 1969 Pontiac automobile was never 'acquired' by Janet Edmonds and in fact could never have been acquired, that the provisions of the policy extending liability coverage for a temporary substitute vehicle, a newly acquired vehicle or a replacement vehicle would not apply.

"Paragraph 1b of Article VI actually extends coverage to the named insured under two separate categories. The first instance in which that paragraph extends coverage to

the policyholder is when the policyholder is operating a motor vehicle, the 'ownership' of which is acquired by the policyholder which has not, except as a replacement, been the subject of such ownership for more than thirty (30) days next preceding the occurrence. As stated by Nationwide in its brief, the intent of this paragraph would be to provide temporary liability coverage for a newly acquired vehicle for up to thirty (30) days after acquisition of ownership. Nationwide however, takes the position that the 1969 Pontiac automobile was stolen and therefore, 'ownership' was never 'acquired' by Janet Edmonds and in support of its position relies upon a decision by the Georgia Court of Appeals, *Gordon v. Gulf American Fire and Casualty Co.*, 113 Ga. App. 755, 149 S. E. (2d) 725 where the question arose in regard to a policy of theft insurance under which it was determined that the described automobile had been previously stolen. In that case the policyholder contended that, as a bona fide purchaser of the vehicle without the knowledge of its being a stolen vehicle, he had an 'insurable interest'. The Georgia Court held that one who purchases stolen property in good faith can acquire no title, hence, no lawful interest or insurable interest.

"Although the Nationwide policy involved here does undertake to define certain terms and phrases in other sections of the policy, it is completely silent in defining the various terms used in Article VI of the policy. Nowhere in the policy is the term 'ownership' defined and it is necessary for this Court to determine what Nationwide meant by specifying that the policyholder must acquire 'ownership' of the automobile which has not, except as a replacement, been the subject of such ownership for more than thirty (30) days preceding the accident.

"The question of 'ownership' has most frequently arisen in cases in which the insurance company seeks to void the policy by establishing that the named insured who has made a claim under a policy, did not have unconditional and sole ownership. These decisions deal primarily with actions in

which the named insured had made a claim against a company under a collision policy or a theft policy and the insurer was seeking to avoid liability on the grounds of misrepresentation of a material fact. See 71 A. L. R. (2d) 223, 234, *Property Insurance Ownership Clause*. The decision of the Georgia Court of Appeals cited by Nationwide in its brief concerned just such an action and involved a discussion of an 'insurable interest' as it related to the term 'ownership'. In the instant action, we are not dealing with a factual situation similar to that confronting the Georgia Court of Appeals but perhaps the correct approach to the meaning of 'ownership' under the Nationwide policy would be to consider whether Janet Edmonds had an 'insurable interest' in the 1969 Pontiac automobile.

"The particular section now under discussion is commonly known as an 'automatic insurance clause' which in standard automoboile liability policies is intended to meet the necessity for maintaining coverage in the situation resultng from the recognized custom among insured owners of acquiring other cars by replacement and new purchases during the life of their policies. The term 'ownership' under an automatic automobile policy includes any insurable interest in the automobile described in the policy. 7 Am. Jur. (2d), *Automobile Insurance,* Section 100. An interesting discussion of 'insurable interest' is found in an annotation in 1 A. L. R. (3d) 1193, *Liability Insurance-Insurable Interest.* As pointout by the author of that annotation, some courts have held that an 'insurable interest' is necessary while other cases have denied the necessity of an insurable interest in liability insurance upon the ground that the risk insured against is not loss to the property named in the policy but the possibility that the insured may be held liable for its use or operation. Other authorities hold that such an insurable interest is not applicable to liability policies as it is to casualty insurance policies and that the right of the insured to recover does not depend upon his being the holder in fact of either a legal or equitable title interest in the policy, but whether he is pri-

marily charged at law or at equity with an obligation for which he is liable. *Blashfield's Cyclopedia of Automobile Law and Practice,* Section 3873 (Permanent Edition). The general trend seems to be that no legal or equitable interest in the insured vehicle as *property* is necessary, but it is enough that the insured may be held liable for damages to its operation and use. The annotation cites many cases to this effect. Of particular interest, is the holding of a Minnesota Court in *Quaderer v. Integrity Mutual Insurance Co.,* 263 Minn. 383, 116 N. W. (2d) 605, in which the Court held that the terms 'ownership' and 'owned by the named insured' under the provisions of the policy included any insurable interest of the insured of the automobile described in the policy. The court ruled that an insurable interest exists when the insured may be held liable incident to the operation and use of the automobile. A similar discussion is found in *Appleman's Insurance Law and Practice,* Vol. 7, Section 4253 and the cases cited in the 1977 Supplement.

"Under the circumstances of this case and in the absence of any provision of the Nationwide policy to define the term 'ownership' this court adopts the view set forth in Appleman's Insurance Law and Practice, Vol. 7, Section 4293, p. 91, in which it is stated:

'Where the policy states in such provision (automatic insurance clause) that coverage is afforded when the insured acquires "ownership", it means such ownership as the ordinary man would contemplate by the term, that is, the right of user and such an interest in its protection that goes with a sense of ownership.'

"The facts of this case lead this court to the conclusion that absent contrary policy provisions or definitions, the named insured Janet Edmonds, acquired 'ownership' of the 1969 Pontiac and that therefore, coverage would apply under paragraph 1b of Article VI to a newly acquired vehicle when the accident occurred less than thirty (30) days after she acquired such vehicle."

While the foregoing from the order of the lower court adequately covers the issues, reliance by appellant and the majority opinion upon *Robinson v. Georgia Casualty and Surety Company*, 235 S. C. 178, 110 S. E. (2d) 255, and *Bankers Insurance Company of Pennsylvania v. Griffin*, 244 S. C. 552, 137 S. E. (2d) 785 requires that the inapplicability of these decisions be pointed out.

In *Robinson*, the father, who owned a 1956 automobile, purchased a policy of automobile liability insurance from St. Paul Mercury Insurance Company covering the 1956 vehicle. The son of the insured did not own an automobile. He needed insurance in order to obtain a driver's license. Accordingly, he purchased from another insurance company, Georgia Casualty, an automobile liability insurance policy insuring the 1956 automobile owned by his father and covered by the St. Paul Mercury policy. Subsequent to the son's purchase of the Georgia Casualty policy, the father traded the 1956 automobile described in both insurance policies as the insured vehicle, and purchased a 1958 automobile, which was likewise registered in the name of the father.

The son, who had the unrestricted right to use the 1958 vehicle, asked a friend to take the automobile and go on an errand for him and, in the course of this trip an accident occurred resulting in the death of a passenger in the automobile. In a suit to recover under the Georgia Casualty policy, issued to the son and covering the 1956 automobile, the question before the court was whether the 1958 automobile was a "newly acquired automobile". The court held that the insuring agreement of that policy specifically required that to afford coverage as a newly acquired automobile, the automobile must be one acquired by the named insured and that he not only must have an insurable interest but he "must own the automobile." The court there defined the phrase "acquired ownership" as meaning "such ownership as the ordinary man ascribes to his *own*."

In *Robinson*, the insured knew that he did not own the automobile and that he did not have such ownership as the

ordinary man would ascribe to his own. There was no fact or circumstance in *Robinson* to give rise to an inference that the son had an insurable interest in the automobile purchased and titled in the name of the father. The court was, therefore, not called upon to decide the issue presented in this case and, to interpret it as authority for denial of coverage here, is to ascribe to it a meaning justified by neither the facts nor the language used.

In *Bankers Insurance Company,* one brother took title to a vehicle as a consequence of being required to sign for his brother's purchase of an automobile. Both brothers had previously acquired liability insurance policies covering other vehicles and each of these policies contained an automatic insurance clause. Thereafter, the automobile was involved in a collision and a question arose as to which of the brother's insurance policies provided coverage. The finding of the lower court, that the brother who held title to the automobile was not the true owner but merely held title in order to guarantee his brother's purchase, was affirmed on appeal; and the policy of the true owner was held liable. The issue in *Bankers Insurance Company* was solely which insured owned the automobile. Liability was properly placed upon the actual or true owner. The question presented here, of whether an insurable interest alone of the insured would support the ownership requirements of the policy, was not involved in that case.

The *Robinson* and *Bankers Insurance* cases are not analogous to the present case. The fact that the present insured could not acquire legal title to the stolen automobile should not be the controlling factor, particularly in view of the fact that the insured, admittedly had no knowledge, actual or constructive, that the automobile had been stolen, but had every reason to believe that she owned the automobile through the gift from her husband and had such an interest in its protection as goes with the sense of ownership. The risk of the coverage afforded the present insured was not extended or increased in any degree by the fact that she was

operating a vehicle which, unknown to her, had been stolen. She not only had an insurable interest but had as great an interest in its protection as a sense of ownership could give. These considerations render the *Robinson* and *Bankers Insurance* cases inapplicable to the present issues and are erroneously relied upon as authority to defeat coverage in this case.

I would affirm the judgment of the lower court.

GREGORY, Justice (dissenting) :

I, too, respectfully dissent from the majority opinion.

At the time of the accident, Janet C. Edmonds was operating an automobile that was owned by someone else. The automobile had been stolen from its true owner, but it is conceded that Mrs. Edmonds neither knew nor had reason to know the automobile was stolen.

The liability coverage provided by Mrs. Edmonds' automobile insurance policy is extended by Section VI(3) to:

". . ..any other land motor vehicle except a temporary substitute land motor vehicle while used by the Policyholder

"Provided . . . such other land motor vehicle:
(i) is not owned by such Policyholder . . .;
(ii) is not furnished for regular use to such Policyholder . . .;
(iv) is not stolen."

The purpose of this provision in the policy is to extend liability coverage to a policyholder who is operating an automobile that is owned by someone other than the policyholder. Here, Mrs. Edmonds incurred liability while operating an automobile she did not own. She had not stolen the automobile and neither knew nor had reason to know it was stolen. In my view, this is the very situation contemplated by Section VI(3).

The result reached by the majority opinion would place a cloud on all automobile liability coverage. Every innocent

policyholder who buys an automobile or is a permissive user risks having no liability coverage if the insurer can trace the title of the automobile to a thief.

I would affirm the lower court and extend coverage under Section VI(3) of Mrs. Edmonds' policy.